UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DEBORAH MARGARET LWANGA,<br><br>　　　Plaintiff,<br><br>v.<br><br>ANDREW SAUL,<br>Commissioner of the Social<br>Security Administration,<br><br>　　　Defendant. | Civil No. 20-10012-LTS |

MEMORANDUM AND ORDER

February 26, 2021

SOROKIN, J.

Deborah Margaret Lwanga seeks reversal and remand of a decision by the Commissioner of the Social Security Administration denying her Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") for the period prior to March 28, 2018. The Commissioner seeks an order affirming his decision. For the reasons that follow, Lwanga's Motion for an Order Reversing the Decision of the Commissioner (Doc. No. 19) is ALLOWED, and the Commissioner's Motion to Affirm the Decision of the Commissioner (Doc. No. 27) is DENIED.[1]

---

[1] Citations to "Doc. No. __ at __" reference items appearing on the Court's electronic docket using the document and page numbers assigned by ECF. Citations to "A.R. at __" are to the administrative record, reproduced at Document Number 15 on the electronic docket, and use the page numbers assigned by the agency and appearing in the lower right-hand corner of each page.

I.      BACKGROUND

A.      Procedural History

On October 18, 2016, Lwanga applied for DIB, alleging an onset date of May 22, 2015.

A.R. at 668.  Her application was denied at the initial level and on reconsideration.  Id. at 528,

541.  Lwanga requested a hearing before an administrative law judge ("ALJ").  Id. at 581.  On

June 29, 2017, Lwanga applied for SSI, her date last insured for DIB purposes having passed.

Id. at 670.  Lwanga's hearing before the ALJ regarding both applications was held on May 3,

2018.  Id. at 68.  In a decision dated June 29, 2018, the ALJ found that Lwanga was not disabled.

Id. at 555.  Lwanga appealed, and the Appeals Council granted review.  Id. at 659, 663.  On

November 2, 2019, the Appeals Council issued a partially favorable decision, adopting the ALJ's

findings for the period prior to March 28, 2018 but finding Lwanga disabled, and awarding SSI,

from that date forward.[2]  Id. at 26.  The Appeals Council's decision was the final decision of the

Commissioner.  Id. at 25-29.  Lwanga filed this action challenging the Commissioner's final

decision on January 6, 2020.  Doc. No. 1.

B.      Personal and Treatment History

Lwanga was fifty-three years old when she applied for DIB in 2016.  She was born and

raised in Uganda, where she suffered significant trauma in the form of childhood physical abuse

and adult domestic violence.  A.R. at 1002-03, 1744.  She left her husband and came to the

United States in 2001, raised her two sons as a single mother, and became a naturalized

American citizen in August 2016.  Id. at 909-10, 1746-47.  She has a degree in business

---

[2] Because Lwanga's date last insured for purposes of her DIB application was September 30, 2015, A.R. at 528, the Appeals Council's award of benefits starting in March 2018 entitled Lwanga to SSI only.  Neither party challenges the Appeals Council's finding of disability for the period beginning on March 28, 2018, so nothing in this Order alters that finding or permits the agency to revisit it on remand.

administration and accounting from a college in Uganda, as well as a degree in finance from the University of Massachusetts.  Id. at 700, 1003.  Her last job in the financial industry ended in 2010.  Id. at 1003.  Since then, her only other work has been a six-month part-time position at a CVS pharmacy that ended with her firing in May 2015, and a seasonal sales position at Macy's for two weeks in December 2016.  Id. at 701-02, 743.

The medical records submitted to the agency detail a history of diabetes dating back at least to 2005.  A.R. at 1546.  Lwanga's diabetes treatment and management is reflected in records from her primary care physician, Dr. Ira Mintzer, and notes memorializing Lwanga's regular sessions with a nutritionist.  E.g., id. at 1367-98.  These records document fluctuations in both Lwanga's level of exercise (including periods of no activity and periods of regular visits to the gym) and her adherence to her recommended diet (including efforts to secure healthy foods, struggles with limiting her consumption of carbohydrates, and periods of food insecurity caused by ongoing financial difficulty).

Beyond her physical conditions, and central to her disability claim, the administrative record reflects Lwanga's substantial history of mental health treatment.  She suffers from anxiety, depression, and post-traumatic stress disorder ("PTSD").  Since at least 2011, she has engaged in ongoing treatment of these conditions, including individual and group therapy and psychiatric medications, with providers at the Cambridge Health Alliance ("CHA") and DCS Mental Health ("DCS").  For the bulk of the relevant time period—May 2015 through March 2018—Lwanga's mental health treatment occurred at DCS.[3]  The Court has carefully reviewed

---

[3] The record also contains reports of Lwanga's treatment at DCS in 2014, and an initial biopsychosocial evaluation of her at DCS in December 2012, marking the beginning of her time being treated there.  A.R. at 1001-08.  Psychotherapy Progress Notes from 2014 describe her levels of subjective distress and functional impairment as fluctuating from "mild" to "moderate" and even "severe" at times.  Id. at 1171-95.

all of these records but will summarize them here only to the extent necessary to explain its

decision to remand.

From her alleged onset date through the date the agency found she became disabled,

Lwanga generally attended weekly hour-long sessions with a therapist at DCS.  For the bulk of

the relevant period, that therapist was Carla Gerber-Weintraub, a Licensed Independent Clinical

Social Worker ("LICSW").  Each session was documented in a one-page Psychotherapy

Progress Note, noting the date and length of the session, rating Lwanga's current level of

subjective distress and functional impairment, measuring her anxiety and depression on a 1-to-10

scale, assessing any change in her condition, and then providing a narrative description of the

content of the session and a short summary of the therapist's clinical assessment.  E.g., A.R. at

888, 1039.  LICSW Gerber-Weintraub nearly always assessed Lwanga's subjective distress and

level of functional impairment as "moderate," rated her anxiety as ranging between a low of 4

and a high of 7 (out of 10) and her depression as ranging between a low of 5 and a high of 8 (out

of 10), and assessed her conditions as "unchanged."[4]  E.g., id.  Her session descriptions often

referenced Lwanga's ongoing difficulty managing her diabetes (e.g., by describing her as

appearing lethargic upon arrival, noting inquiry by the clinician regarding when Lwanga last ate,

then stating Lwanga perked up after a snack).  E.g., id. at 930, 1105.  In her clinical assessments,

LICSW Gerber-Weintraub generally portrayed Lwanga as "alert," with "linear and clear"

thoughts, and described her mood as "within baseline with congruent affect" (i.e., consistent with

---

[4] On the progress note form, a patient's levels of subjective distress and functional impairment
can be designated "none," "mild," "moderate," or "severe."  The clinician's assessment of a
patient's identified condition (e.g., Lwanga's depression and anxiety) can be "worse,"
"unchanged," "improving," or "stable in desired range."  The Court noticed no progress notes
rating either of Lwanga's conditions as "stable in desired range."

a person experiencing anxiety measured at 4-to-7 out of 10 and depression measured at 5-to-8 out of 10).  E.g., id. at 888.

During her time in therapy at DCS, Lwanga's clinicians prepared quarterly treatment plans in which Lwanga's diagnoses were consistently described as major depressive disorder ("MDD") designated "recurrent, moderate," and PTSD.  E.g., id. at 984.  They identified the two "problems" being addressed in treatment as Lwanga's anxiety and depression, consistently described "no change" as her progress in treatment, set long-term goals of reducing Lwanga's symptoms to levels between 0 and 2 out of 10 (a result never achieved, per the available records),[5] and consistently described various "observable behavior[s]" Lwanga exhibited as symptoms of her anxiety and depression.  E.g., id. at 985 (listing "heart palp[i]tations, sweaty palms, future worry, [and] financial stress" as indicators of her anxiety, and "hypo-sleeping, low mood, loss of interest, fearful, [and] isolation" as indicators of her depression).  Each treatment plan required the clinician (usually LICSW Gerber-Weintraub) to rate the severity of a two-column list of risk factors.  For Lwanga in 2016 and 2017, the plans frequently assessed her with, inter alia, moderate deficits in memory, attention, and concentration.  E.g., id. at 984.

Lwanga also participated in group therapy at DCS.  Progress notes from those sessions reflect she was often late and sometimes reported difficulty sleeping or failure to eat as impacting her mood.  E.g., id. at 887.  In January 2017, Lwanga's participation in group sessions began to diminish.  Id. at 1042.  By May 2017, Lwanga was withdrawn and engaged in negative attention seeking, and by June 2017, LICSW Gerber-Weintraub determined that group work was

---

[5] The plans also set short-term goals that the records suggest were not achieved, despite Lwanga's consistent engagement in therapy and the aid of prescribed medications.  E.g., A.R. at 985 (identifying short-term goal of reducing anxiety to "3 out of 10" and depression to "4 out of 10" by January 2017).

not a good fit for Lwanga at that time.  Id. at 1042, 1608, 1611, 1613, 1605.  These are the only reports in the record that document Lwanga's problems with group therapy; there are no records suggesting she resumed group therapy at a later time.

Besides individual and group therapy, Lwanga also attended monthly appointments to review her prescribed medications.  During the relevant time period, Lwanga was prescribed multiple medications to treat her mental conditions, including several that are characterized as antipsychotics.  See A.R. at 1736-37 (listing Lwagna's current and previous medications as of November 2018).  The clinicians who managed her medications at DCS—first Dr. Ernst Manigut, whom Lwanga saw nine times in 2015, and then Nurse Practitioner Geoffrey Whitley, whom Lwanga saw for the remainder of her time being treated at DCS—documented their visits with her, including assessing the severity of her diagnosed conditions as ranging from mild and stable to severe and worsening at various times, and adjusting her medications as necessary. E.g., id. at 1586.

During her time treating at DCS, the record also reveals multiple occasions on which Lwanga reported to her treatment providers and/or visited a hospital's emergency room due to chest pain that ultimately was assessed as a panic attack.  See id. at 1512 (documenting chest pain in March 2015 attributed to Lwanga's response to perceiving that she was being treated unfairly by her supervisor at CVS); id. at 1517 (reflecting a recurrence of stress-related chest pain in April 2015);[6] id. at 1563-64 (noting chest pain in January 2017 arising from Lwanga's

---

[6] A progress note from Lwanga's therapist describing a session between the March and April 2015 episodes of chest pain assesses her PTSD and anxiety as "worse" and describes Lwanga as appearing "tired," "hungry," and "appear[ing] to be having difficulty understanding" her therapist.  A.R. at 977.  This evidence that Lwanga struggled with her mental impairments during the time when she was employed on a part-time basis at CVS bears on an assessment of the impact of her impairments on her ability to maintain employment (and, conversely, the manner in which functioning in a work environment impacts her mental health symptoms).

anxiety); <u>id.</u> at 1586 (noting September 2017 hospital visit due to chest pain and difficulty breathing); <u>see also</u> <u>id.</u> at 1648-49 (reflecting conclusion of doctor who assessed Lwanga in October 2017 that her problems were primarily "emotional," and that her anxiety had led to a number of recent emergency room visits for severe headaches and chest pain).

In March 2018, Lwanga transitioned her mental health treatment to CHA, apparently as a result of a change in her insurance coverage. A.R. at 1684. The administrative record reflects that, once at CHA, Lwanga's treatment primarily consisted of regular appointments with Dr. Michelle Heller for counseling and medication management.[7] <u>Id.</u> at 1734-1903. Dr. Heller's progress notes include descriptions of Lwanga's mental health and treatment history; they are not limited to current symptoms and contemporaneous events. For example, Dr. Heller references a 2006 incident when Lwanga became angry at work and grabbed the clothes of a coworker, positing that Lwanga was likely "psychotic at the time." <u>Id.</u> at 1764. She also includes extensive quotes of comments by Lwanga—for example, describing dreams about her deceased husband or the circumstances surrounding her terminations from previous jobs—that Dr. Heller suggests show she experiences paranoid delusions.[8] <u>E.g.,</u> <u>id.</u> Many of these comments, as well as other historical information, are repeated by Dr. Heller in subsequent progress notes.

---

[7] Lwanga's sessions with Dr. Heller generally occurred weekly, with most sessions lasting half an hour or less. A.R. at 1734-1903. Lwanga also met with a CHA social worker who assisted her with completing disability forms and managing her finances. <u>E.g.,</u> <u>id.</u> at 1835-38.

[8] Lwanga made a similar apparently delusional statement in her testimony before the ALJ. When asked about her memory and concentration, Lwanga claimed that her memory had "been tampered with." A.R. at 65. A February 2017 function report also memorializes such a statement, with Lwanga explaining her previous terminations from "[e]very job [she] ha[s] worked" this way: "Things happen to me mysteriously when [I] am still on training sometimes." A.R. at 752.

C.    Opinion Evidence

At the heart of this Court's evaluation of the administrative treatment of Lwanga's disability claim is the opinion evidence in the record and the question whether it provides substantial evidence supporting the determination that Lwanga was capable of working between May 2015 and March 2018.  There are five pertinent opinions addressing the limitations Lwanga's mental impairments place on her ability to work.

On December 29, 2016, Lwanga's records were reviewed by Dr. Laura Weissberg, a state agency physician who assessed Lwanga's impairments and her residual functional capacity ("RFC").[9]  A.R. at 533-39.  Dr. Weissberg reviewed Lwanga's history, noting the existence of severe affective disorder and anxiety, but opined that neither condition met the criteria required to compel a finding of disability under agency regulations.  Id. at 533-354.  In assessing Lwanga's RFC, Dr. Weissberg observed that Lwanga was a "[b]right woman with two degrees," and found she was not "significantly limited" in a number of areas.  Id. at 535-36.  However, Dr. Weissberg did conclude that Lwanga was "[m]oderately limited" in the following areas:  "ability to carry out detailed instructions"; "ability to work in coordination with or in proximity to others without being distracted by them"; "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods"; "ability to ask simple questions or request assistance"; and "ability to accept instructions and respond appropriately to criticism from supervisors."  Id.

---

[9] An individual's RFC is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments.  20 C.F.R. §§ 404.1520(e), 404.1545.

Dr. Weissberg further explained that the symptoms of Lwanga's "depression and PTSD including intermittent poor sleep and subsequent fatigue interfere[] with sustained attention and pace at times," though Dr. Weissberg believed that "overall, [Lwanga] is able to sustain adequate attention and pace" for periods of two hours at a time over an eight hour work day for five days a week.  Id. at 536.  She also expressly found that Lwanga's PTSD symptoms "interfere with [her] ability to request assistance" and can cause her to "overreact to criticism."  Id.

On November 27, 2017, Dr. Kathleen Silva examined and evaluated Lwanga for purposes of eligibility for state disability benefits.  Id. at 1650-53.  Dr. Silva gave Lwanga a mental status exam and assigned a score of 28 out of 30, stating that Lwanga was able to perform basic tasks of comprehension, memory, and attention.  Id. at 1651-52.  She opined, however, that Lwanga "has depression and panic disorder, which appear to be at a level of moderate involvement," that she "continues to have some panic attacks," and that her depression causes active symptoms including "difficulty with energy, concentration, sleep, and memory."  Id. at 1652.  She also noted that Lwanga "experiences a chronic feeling of palpitation in her head." Id.; see id. at 1735 (reflecting that a year later Dr. Heller documented Lwanga's description of a "pulse in [her] head" when she feels "stressed").

Dr. Mintzer, Lwanga's long-time primary care physician, completed a physical RFC questionnaire on December 19, 2017.  A.R. at 1655-63.  He noted Lwanga's diagnoses of insulin-dependent diabetes, hypertension, and anxiety disorder, rating her prognosis as "fair."  Id. at 1655.  He indicated that her depression and anxiety impacted her physical condition and opined that her symptoms "frequently" interfere with her attention and concentration.  Id. at 1656.  He opined that Lwanga has a "marked limitation" in her "ability to deal with work stress," that she would require two 15-minute unscheduled breaks during an eight-hour workday, that her

impairments cause her to have "'good days' and 'bad days,'" and that she would be absent from work due to her impairments "three times a month."[10]  Id. at 1657-59.

The record also contains a "Mental Impairment Questionnaire (RFC & Listings)" signed by Dr. Manigut and LICSW Gerber-Weintraub on February 22, 2018.[11]  A.R. at 1672-79.  Dr. Manigut and LICSW Gerber-Weintraub noted Lwanga's diagnoses of MDD and chronic PTSD "with dissociative symptoms."  Id. at 1672.  They identified her "signs and symptoms" as including, among other things: poor memory, sleep and mood disturbances, emotional lability, recurrent panic attacks, difficulty thinking or concentrating, social withdrawal or isolation, decreased energy, psychomotor agitation or retardation, and blunt, flat, or inappropriate affect. Id.  They expressed their view that Lwanga's symptoms are "exacerbated by poor diabetic management such as skipping meals and medication non-compliance," stating that her "poor self-care is directly affected by her symptoms of" MDD and that her past trauma "causes severe nightmares, flashbacks, and hypervigilance."  Id. at 1673.  They went on to describe in detail their clinical findings, including observations of "socially inappropriate behavior in a group setting," her tendency to appear "angry and sad" and "overwhelmed," her "limited insight and poor judgement," and the fact that she "often dissociates."  Id.  When asked about her prognosis, they opined that her impairments "will require lifelong treatment," and they noted having

---

[10] There are problems with Dr. Minter's report, which his own responses state did not apply retroactively, but rather as of its December 19, 2017 date.  A.R. at 1659.  He provided minimal explanatory information and included physical limitations that do not appear to be reflected elsewhere in the record.  See, e.g., id. at 1655 (responding "insulin dependence," without more, when asked to "[i]dentify the clinical findings and objective signs"); id. at 1657 (indicating Lwanga could stand for only ten minutes at a time).  These issues do not bear on the reasons causing this Court to remand for further consideration, but the agency is obviously free to consider them on remand insofar as they bear on the weight to be accorded to Dr. Mintzer's opinion.

[11] Based on the handwriting, it appears as though the form was completed by LICSW Gerber-Weintraub, who by that time had been treating Lwanga weekly for more than two years.

observed in her an increasing tendency to convert her mental conditions into physical symptoms. Id. at 1674.

As to the manner in which Lwanga's impairments would impact her ability to work, Dr. Manigut and LICSW Gerber-Weintraub identified the following limitations:  more than three absences a month; moderate limitations in remembering work procedures, carrying out instructions, maintaining regular attendance and punctuality, sustaining an ordinary routine without special supervision, working in coordination with or near others, making simple work-related decisions, performing at a consistent pace, asking questions or requesting assistance, responding appropriately to changes, dealing with normal work stress, and independently setting realistic goals or plans; and marked limitations in understanding and remembering instructions, maintaining attention and concentration for four two-hour sessions in a day, completing a normal workday and workweek without interruptions from her symptoms, accepting instructions and responding appropriately to criticism from supervisors, interacting appropriately with the public and co-workers, and maintaining socially appropriate behavior.  Id. at 1675-76.  Dr. Manigut and LICSW Gerber-Weintraub went on to explain their assessments of "marked" limitations in four broad areas:  understanding, remembering, and applying information; interacting with others; concentrating, persisting, and maintaining pace; and adapting and managing herself.  Id. at 1677-78.  Finally, they endorsed a likelihood that several typical work-related stressors would exacerbate Lwanga's level of impairment in a work setting.  Id. at 1679.

On March 1, 2019, Dr. Adam Cox reviewed the administrative record and responded to interrogatories by the Appeals Council in connection with Lwanga's request for review.  Id. at 1721-22.  He opined:

> This case involves a woman who is affected by depression, traumatic stress, delusions, impulsive anger, social limitations, and anxiety.  She has been affected

> by elements of the syndromes for a number of years . . . but there is not definitive evidence of severe impairments until March, 2018 (Cambridge Health Alliance). At that time the . . . claimant's behavior is described in great detail, indicating problems functioning in group therapy, social inappropriateness, impulsivity, poorly controlled anger, and overt delusions.   There is a strong element of grandiosity to the claimant's delusions in which she feels that she has been identified for persecution.
>
> Given the severity of the claimant's symptoms over the past year she does not seem capable of meeting basic expectations in a conventional work setting.  Conversely, she appears to be the type of person who would be a liability to an employer. Although her symptoms are somewhat lessened by psychoactive medication, she continues to be symptomatic to an extent of needing frequent, intensive psychiatric intervention. . . . I believe there is reasonable psychological certainty that this individual will continue to be affected by severe mental health problems.

Id. at 1721.  This assessment led Dr. Cox to conclude that Lwanga satisfied the criteria for three separate disorders the agency identifies as triggering a finding of disability.  Id. at 1721-22.  In explaining his conclusion, Dr. Cox identified Lwanga's limitations as including "a marked impairment in [her] ability to interact with other people," "a moderate to marked impairment in [her] ability to concentrate, persist, and maintain pace," and "a marked impairment in [her] ability to adapt and manage herself in a work setting."  Id. at 1722.  Because of his determination that a finding of disability was required under the regulations, he did not assess Lwanga's RFC.

     D.    The Administrative Decisions

    As the Appeals Council largely adopted the ALJ's findings with respect to the period that is the focus of Lwanga's appeal, the Court will summarize both the ALJ's and the Appeals Council's decisions.

    The ALJ first found that Lwanga met the insured status requirements of the Social Security Act and that she was last insured on September 30, 2015.  Id. at 558.  At the first step of

the usual five-step sequential evaluation applicable to disability claims,[12] the ALJ found that Lwanga had not engaged in substantial gainful activity since her alleged onset date of May 22, 2015.  Id. at 558.  At step two, he found that Lwanga suffered from two severe impairments: depression and anxiety.  Id.  He also discussed Lwanga's history of diabetes, but said her "benign findings and conservative treatment support a conclusion that" it was not severe.  Id. at 558-59.  At step three, the ALJ concluded that Lwanga's conditions did not meet or medically equal any impairment in the relevant appendix to the regulations, saying she experiences only "mild limitation in understanding, remembering, or applying information; moderate limitation in interacting with others; mild limitation in concentration, persisting, or maintaining pace; and no limitation in adapting or managing oneself."  Id. at 559-60.

The ALJ next determined Lwanga's RFC, finding she could perform "a full range of work at all exertional levels" with only two limitations: "only occasional interaction with the public (only superficial interpersonal interactions)," and "only occasional interaction with coworkers and no tandem tasks."  Id. at 560.[13]  In reaching this conclusion, the ALJ explained why he did not fully credit Lwanga's subjective description of the extent of her symptoms and summarized her treatment history.  Id. at 561-65.  He acknowledged evidence of Lwanga's "difficulty with appropriate behavior at group therapy," but characterized it as an "intermittent"

---

[12] The steps in the analysis are: 1) whether the claimant is engaged in substantial gainful activity (if so, she is not disabled and the inquiry ends); 2) whether the claimant has a severe impairment or combination of impairments that is severe (if not, she is not disabled and the inquiry ends); 3) whether any of the claimant's impairments meet or medically equal an impairment listed in an appendix to the relevant regulations (if so, she is disabled and the inquiry ends); 4) whether the claimant is able to perform her past relevant work (if so, she is not disabled and the inquiry ends); and 5) considering the claimant's age, education, work experience, and RFC, whether she is capable of performing other work (if not, she is disabled).  20 C.F.R. § 404.1520(a)(4); Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).

[13] The ALJ provided that "occasional means less than 1/3 of an 8 hour workday."  A.R. at 560.

problem that was sufficiently addressed via "the assessed moderate social limitations." Id. at
564.  He characterized her memory as "unimpaired," her psychiatric functioning as "stable," and
attributed any "occasional[] . . . difficulties with energy and motivation" or "dissociation" to
"poor nutrition." Id. at 564-65.  Relying primarily on her activities of daily living, including
church attendance and vocational training, the ALJ found no limitation in Lwanga's ability to
adapt or manage herself. Id. at 565.

Next, the ALJ evaluated the proffered opinion evidence.  He gave "little weight" to the
report completed by Dr. Manigut and LICSW Gerber-Weintraub, finding it was "not consistent
with the longitudinal treatment record" and was undermined by Lwanga's ability to complete
two full-time weeks at a seasonal job in December 2016. Id.  The ALJ said he "accorded
significant weight" to Dr. Weissberg's opinion, finding it was "consistent with the medical
evidence of record describing intact cognitive and intellectual skills" and was "not substantially
contradict[ed]" by "evidence received at the hearing level." Id. at 565-66.  Regarding Dr.
Mintzer, the ALJ found his report was "entitled to little weight," as it was "not consistent with
the objective medical evidence including Dr. Mintzer's own treatment records." Id. at 566.
Finally, the ALJ explained that a state disability assessment relying on Dr. Silva's report did not
satisfy the federal standards for a finding of disability. Id.

The ALJ concluded at step four that Lwanga was unable to perform her past relevant
work as an accountant, accounting clerk, or personal care assistant. Id. at 567.  At step five,
however, the ALJ found that there were jobs Lwanga was capable of performing considering her
RFC as he had assessed it. Id.  Accordingly, the ALJ concluded Lwanga was not disabled. Id.

In its subsequent decision, the Appeals Council adopted the ALJ's "findings or
conclusions regarding whether the claimant is disabled for the period prior to March 28, 2018."

A.R. at 6.  However, the Appeals Council parted ways with the ALJ at step three of the analysis from March 28, 2018 on, and it entered a finding of disability for that period relying on Dr. Cox's opinion that Lwanga's mental impairments satisfied the criteria for three separate listings, as well as the records documenting Lwanga's treatment at CHA from March to November 2018. Id. at 6-7.

## II.   LEGAL STANDARDS

This Court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  The Court may not disturb the Commissioner's findings where they are supported by substantial evidence and the Commissioner has applied the correct legal standard. Id.  Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971); accord Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  This standard of review "is more deferential than it may sound to the lay ear." Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018).  The Court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence."  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987).  But, when the Commissioner's finding is not supported by substantial evidence or results from an error of law, the Court will not uphold it.  42 U.S.C. § 405(g); accord Seavey v. Barnhart, 276 F. 3d 1, 9 (1st Cir. 2001).  And, if an ALJ's findings of fact are "derived by . . . judging matters entrusted to experts," they "are not conclusive."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).

An ALJ assessing a claimant's RFC must "consider all of [the claimant's] medically determinable impairments of which [the ALJ is] aware, including [the claimant's] medically determinable impairments that are not 'severe'" 20 C.F.R. § 404.1545(a)(2); see McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1127 (1st Cir. 1986) (emphasizing that non-severe physical, mental, and psychological impairments "might in combination . . . make it impossible for a claimant to work").  However, the ALJ need not discuss in detail how the claimant's various limitations would work in concert to affect the RFC determination.  See Snow v. Barnhart, No. 05-cv-11878, 2006 WL 3437400, at *6 (D. Mass. Nov. 29, 2006) (ALJ's "comprehensive discussion of [claimant's] physical and mental impairments" fulfilled the required combined effects analysis).

When an ALJ evaluates RFC, he "should consider a claimant's mental health history and the opinions of her doctors." Connolly v. Astrue, No. 11-10798-RGS, 2011 WL 6888645, at *7 (D. Mass. Dec. 30, 2011).  In general, "an expert is needed to assess the extent of functional loss," Roberts v. Barnhart, 67 F. App'x 621, 622-23 (1st Cir. 2003), especially when the ALJ is called upon to "assess[] the effects of substantial mental impairments on a claimant's" RFC, Maniscalco v. Colvin, 167 F. Supp. 3d 207, 217 (D. Mass. 2016) (discussing Rivera-Figueroa v. Sec'y of Health & Human Servs., 858 F.2d 48, 52 (1st Cir. 1988)).  See also Rivera-Torres v. Sec'y of Health & Human Servs., 837 F.2d 4, 7 (1st Cir. 1988) (holding that the record must generally include "an [expert's] explanation of claimant's functional capacity," as the agency is "not competent to interpret and apply raw medical data").  The First Circuit has recognized a "narrow exception" permitting an ALJ to "render[] common sense judgments about functional capacity based on raw medical evidence, as long as the ALJ dose not overstep the bounds of a lay person's competence." Maniscalco, 167 F. Supp. 3d at 217 (citing Gordils v. Sec'y of Health

& Human Servs., 921 F.2d 327, 329 (1st Cir. 1990)).  However, an RFC determination that is not grounded in an expert's assessment—either because the record lacks such an assessment or because the ALJ has rejected the assessments it does contain—ordinarily will not survive even substantial evidence review.  Id.

III.    DISCUSSION

Lwanga argues that the ALJ erred in upholding the denial of her application for benefits for the period prior to March 28, 2018.  In particular, she asserts that the Appeals Council's finding that she was not disabled until March 28, 2018 was arbitrary and not supported by substantial evidence, levying several discrete challenges to the RFC determination made by the ALJ and adopted by the Appeals Council for the relevant period.  She also contends that the Appeals Council erred by declining to exhibit records from CHA submitted after the ALJ's decision.  After careful review, the Court finds that remand is necessary for the following reasons.

First, the RFC determination is not substantially supported by any of the expert opinions in the record, and this is not a straightforward case in which the raw medical evidence would permit a layperson to assess Lwanga's limitations.[14]  The RFC assessed by the ALJ included only two limitations, which generally restricted Lwanga's interactions with the public and her coworkers.[15]  The ALJ gave "little weight" to the opinion of Dr. Mintzer and the opinion of Dr.

---

[14] Because the Appeals Council did not independently weigh or otherwise evaluate the medical evidence for this period, it is necessary to examine the ALJ's treatment of this evidence, which the Appeals Council adopted.

[15] Elsewhere in his decision, the ALJ stated that his review of the record led him to conclude that Lwanga had mild limitations in "understanding, remembering, or applying information" and with "concentrating, persisting, or maintaining pace."  A.R. at 564.  He did not, however, incorporate any limitations addressing these areas in his RFC determination, and even those conclusions are not supported by Dr. Weissberg's opinion.

Manigut and LICSW Gerber-Weintraub and, thus, did not incorporate in the RFC numerous additional limitations proposed by those providers (all of whom had treating relationships with Lwanga).  Instead, the ALJ claimed to place "significant weight" on the opinion of Dr. Weissberg in his consideration of Lwanga's RFC.[16]  However, a comparison of Dr. Weissberg's actual opinion with the limitations the ALJ included in his RFC reveals that the former does not support the latter.

According to Dr. Weissberg, Lwanga was "moderately limited" in a number of areas besides her ability to work and interact with others.  She found such limitations with respect to Lwanga's ability to carry out detailed instructions, ask simple questions or request assistance, and accept instructions and respond appropriately to criticism from supervisors.  A.R. at 535-36. Lwanga rightly contends that these aspects of Dr. Weissberg's report are inconsistent with— indeed, they are not accounted for at all in—the ALJ's RFC assessment and its circumscribed limitations governing only her ability to interact with co-workers and the public.  Doc. No. 20 at 15.  The Commissioner attempts to skirt this error by arguing that the ALJ's assessment was "in fact, *more restrictive* than" Dr. Weissberg's opinion, and that Dr. Weissberg's analysis of the relevant records "is more than enough to persuade a reasonable mind that [Lwanga] could tolerate underlined work with social limitations."  Doc. No. 28 at 19 (italics in original, underlining supplied).  But the Commissioner is simply, and doubly, wrong.  For one thing, as should already be clear from the preceding discussion, the two restrictions contained in the

---

[16] Dr. Weissberg is an agency consultant who reviewed records of Lwanga's treatment history but never met or examined her, and who rendered an opinion more than a year before the ALJ hearing and without the benefit of records detailing Lwanga's treatment in the intervening time period.  This status merits noting but does not foreclose reliance on her opinion, so long as it is consistent with the objective medical evidence and the ALJ provides sufficient explanation of his decisions regarding what weight to accord to which expert opinions.

ALJ's RFC plainly do not account for Dr. Weissberg's findings of moderate limitations in several additional areas.  For example, it includes no limitation addressing Lwanga's documented difficulty seeking assistance and responding to criticism from supervisors.[17] Additionally, the RFC at issue does not restrict Lwanga to "unskilled" work, as the Commissioner suggests.  Such a limitation, which might suggest that the ALJ endeavored to account for Dr. Weissberg's finding that Lwanga was moderately limited in carrying out detailed instructions and asking simple questions, is nowhere to be found in the ALJ's decision.

So, the ALJ essentially rejected all but one expert opinion, and the only one he purported to credit indicates Lwanga's mental impairments present more limitations than those accounted for in the RFC.  As such, the Court concludes that the ALJ's "findings with regard to [Lwanga's RFC] appear to be premised on his own judgment and interpretation of the medical evidence." Maniscalco, 167 F. Supp. 3d at 219.  The record of Lwanga's well-documented treatment for conditions the ALJ himself deemed "severe" cannot fairly be read as suggesting her impairments "are so mild that they pose no significant functional restrictions," thereby permitting the ALJ to rely on his own lay assessment without a supporting expert opinion.[18]  Id.  Accordingly, the

---

[17] Dr. Weissberg's finding that this area poses a problem for Lwanga is consistent with the opinion of Dr. Manigut and LICSW Gerber-Weintraub, and it is also supported by objective medical evidence showing that physical manifestations of Lwanga's stress in response to perceived unfairness perpetrated by her supervisor at CVS led her to seek emergency medical care for panic attacks twice in two months.

[18] For example, it is not at all clear from the record that Lwanga "has experienced no limitation" when it comes to "adapting or managing" herself.  A.R. at 564.  Though the ALJ explains this finding by stating she "has not required . . . emergency treatment for psychiatric symptoms since the isolated episodes of chest pain before the alleged onset of disability," id., as noted above the record does contain evidence that she continued to have panic attacks with physical symptoms that sent her to emergency rooms in 2017, id. at 1563-64, 1586, 1648-49.  Such evidence appears to support the findings of Dr. Manigut and LICSW Gerber-Weintraub that Lwanga's anxiety triggers physical symptoms.  Furthermore, it bears noting that the "isolated episodes" the ALJ referenced arose from work-related stress Lwanga experienced at the last job she had that lasted more than a couple of weeks.

agency's determination of Lwanga's RFC was not supported by substantial evidence, and remand is required.  On remand, the agency shall reexamine the expert opinion evidence, mindful of the regulations governing the weighing of such evidence,[19] and reevaluate Lwanga's RFC for the period between her alleged onset date and March 28, 2018 in light of her severe mental impairments and, to the extent it is intertwined with or exacerbated by those impairments, her diabetes.

Second, the Appeals Council found Lwanga disabled as of March 2018 at step three of the requisite analysis.  Its explanation for this finding—and the 2018 CHA records and the assessment of Dr. Cox upon which it relied—cited symptoms and clinical findings that arose from earlier events documented in the DCS records (and then recounted or summarized by Dr. Heller in her own notes).  For example, Dr. Cox, in a report accorded "substantial weight" by the Appeals Council, A.R. at 7, cited Lwanga's "problems functioning in group therapy" and her "poorly controlled anger" in finding she satisfied the criteria of the relevant listings, id. at 1721. But Lwanga's "problems" in group therapy occurred in 2017, not during her time treating with Dr. Heller, id. at 1042, 1605, 1608, 1611, 1613, and the only description anywhere in the record of an incident involving Lwanga's uncontrolled anger references a dispute with a co-worker

---

[19] The parties agree that evaluation of the opinion evidence here is governed by 20 C.F.R. §§ 404.1527 and 416.927, as Lwanga submitted her original application for benefits before the amended versions of these regulations took effect.  Doc. No. 20 at 16 n.13; Doc. No. 28 at 28 n.9.  The record establishes that both Dr. Mintzer (Lwanga's primary care physician for all of the relevant time period) and Dr. Manigut (whom Lwanga saw nine times in 2014 and 2015 for management of her psychiatric medications, including days before her alleged onset date), qualify as "treating sources" under those regulations.  20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  On remand, in reconsidering the opinion evidence and reassessing Lwanga's RFC, the agency shall explain its decision regarding what weight to accord the opinions of Drs. Mintzer and Manigut with reference to the regulations governing treating source evidence.

from 2006, id. at 1735.[20]  Other symptoms identified by the Appeals Council as supporting its step-three finding also were observed and documented by the individuals who treated Lwanga during the relevant time period.  Compare, e.g., A.R. at 7 (referencing "panic attacks," "problems sleeping," "psychomotor agitation or retardation, decreased energy, and difficulty concentrating or thinking," "involuntary re-experiencing of [a] traumatic event (for example, intrusive memories, dreams, or flashbacks)," and "disturbance in mood"), with id. at 1672 (endorsing all of the same symptoms).  See also, e.g., id. at 984-85 (indicating many of the same symptoms present when October 2016 treatment plan was created).

Against this backdrop, Lwanga calls the Appeals Council's selection of onset date arbitrary, arguing it "is not plausible that on March 27, 2018" she had only the moderate social limitations in two areas (as described in the RFC), but on the following day "without any intervening event to cause a significant deterioration in functioning, she had marked restrictions" in additional areas that entirely precluded her from working.  Doc. No. 20 at 16.

The Appeals Council neither acknowledged the extent to which the evidence it cited depended on the earlier records, nor explained why the earlier records contemporaneously documenting the relevant events or citing the same symptoms were insufficient to justify the same step-three finding at an earlier time.  Absent further explanation by the agency regarding its selection of March 28, 2018 as the date when Lwanga first satisfied the cited listings—and, in particular, some effort to account for the decision to grant substantial weight to Dr. Cox while

---

[20] Similarly, Dr. Cox, echoed by the Appeals Council, stated that a person "affected by severe psychiatric symptoms will have at least some difficulty with learning and retention."  A.R. at 7, 1721.  But the records of Lwanga's treatment at DCS during the relevant period and the opinion from Dr. Manigut and LICSW Gerber-Weintraub reflect that Lwanga suffered from a host of ongoing symptoms of her anxiety and depression—conditions which both her treating clinicians in their quarterly treatment plans and the ALJ in his decision deemed "severe" and, applying the same reasoning, likely to case "at least some difficulty with learning and retention."

continuing to give little weight to the facially similar findings of Dr. Manigut and LICSW Gerber-Weintraub—there is not substantial evidence supporting the Appeals Council's choice of onset date.  On remand, the agency shall reconsider the extent to which the evidence illuminating Lwanga's symptoms and impairments before March 28, 2018 is consistent with (and perhaps substantially factored into) Dr. Cox's assessment.

Finally, Lwanga faults the Appeals Council's refusal to exhibit additional medical records documenting her treatment at CHA between 2011 and 2017.  Because remand is necessary for the reasons already explained, the Court need not resolve whether the Appeals Council should have accepted those records when it first considered Lwanga's claim.  On remand, the Appeals Council shall reexamine the additional CHA records in light of this Memorandum and Order and shall consider anew whether they provide information material to its assessment of Lwanga's impairments and limitations between May 22, 2015 and March 28, 2018, thereby meriting their acceptance pursuant to the relevant regulation.  See 20 C.F.R. § 404.970(a)(5).

IV.    CONCLUSION

For the foregoing reasons, Lwanga's motion for an order reversing or remanding the Commissioner's decision (Doc. No. 19) is ALLOWED, and the Commissioner's motion for an order affirming his decision (Doc. No. 27) is DENIED.  The matter is REMANDED to the agency for further proceedings consistent with this Memorandum and Order.  A separate judgment will issue.

SO ORDERED.


/s/ Leo T. Sorokin
United States District Judge